May it please the Court. My name is John Seidlitz. I have the pleasure to argue today on behalf of Marvalee Singleton. I'd like to reserve four minutes for rebuttal if I can please. Marvalee Singleton is a individual who had applied for Title II and Title XVI Social Security Disability Benefits, went through the hearing process, was denied benefits. We have gone through the District Court and that brings us before the Court today. Marvalee Singleton was 35 years old at the time she applied for disability benefits. She was a woman whose medical history shows that she had been working part-time throughout the course of the period before she applies. She has been working on Oxycontin, she's a number of medications. The treating physician has been providing her throughout the course before she alleges a disability date. One of the issues that comes up, she'd applied and said she was disabled in 98. She didn't understand I think the earnings. That's when her problem started. But that was amended, her onset was amended to October of 2008. And as of October... Did she continue to work after that as of that time? And again, that's what brings us here today from the ALJ, I'm not certain. But the earnings after 2008 were not SGA. So she wasn't making enough in the part-time work to disqualify her under Social Security's rules because of income. So she goes to the hearing and she has an 11th grade education. She has no GED. Her work is as a cook, a taco cook, which I think is what she was doing as of the time of the hearing, part-time taco cooking. Medical records from the treating physician are from a city county health department. And the commissioners argued they are somewhat scant in terms of exams. What the doctor had throughout the course of her treatment were objective records. One was an MRI that she had out here in Oregon in 2003. And then second, she eventually gets a hold of a 2010 MRI that they've done out in Montana. And the... And counsel, can I ask you, so did Dr. Norum have that May 24th, 2010 MRI? Yes, she had both of them. Counsel for the commissioner refers to them in their brief, citing from page 392, where the report said that they did not have any change. But she had the Oregon one, and she had been waiting at the time of one of the reports that she did, she was waiting in her notes to say we've written and we've been trying to get a hold of the Great Falls Clinic MRI. But yes. Well, I guess I was confused by the... Tell me if I'm remembering this right. Did the ALJ cite as one of the bases for rejecting the opinions of the treating physician, Dr. Norum, was that, well, a lot of the doctor's findings were based just purely on the subjective complaints of the claimant? And I guess I was confused because I thought that that 2010 MRI, at least, would have been, you know, pretty solid objective evidence that there really was something wrong with her back. So maybe you can help me... I'll ask your opponent the same question, but maybe you can help with that. You'll have better luck asking him because I cannot answer that question. When I read how bad this woman's back is from that objective report, it's impossible for me to answer that question. And I think if you look at the treatment history, even before her onset of disability, she was working and being medicated with some heavy-duty pain medications in order to work. And the doctor, who eventually fills out the form based upon the MRI, saying this woman is going to have days that she's going to miss each month, when the claimant came in and said I've applied for Social Security Disability, the claimant told her she needs to do that. This woman cannot keep working. And so this was something that she'd had objective findings, both from the Oregon MRI and then subsequently from the 2010 Montana MRI. And I don't know what else she would need in terms of objective findings. It's a bad back when she eventually gets some kind of approval. She sends her to a Dr. Ward in Gray Falls. Dr. Ward does an injection to see if he can find the source of the pain in the spinal canal. And so he does the injection with a little lidocaine and marcaine or some of the steroids. And when he does that, she's got a couple, three hours of relief. Now that's not meant to say here's the solution, because it disappears pretty rapidly. The body MRI findings. And he says, and his job is just doing this evaluation, she's ready now for a surgical consult. So now in terms of the objective problems this lady has based upon the MRI findings that have gone consistently throughout this whole period of time, is now they're talking this lady needs surgery to fix it. So when we're talking about objective findings, I don't know what else she could have had. I don't. But throughout the course of time she is medicated through various different medications they've tried. It goes through the period of time increasing medications. They In terms of consistent opinions throughout the time, during an annual physical in August of 9, Dr. Norm again says in her notes, this lady cannot maintain much employment because of her horrible back condition. Now in terms of the assessment, and that maybe brings us here today in terms of why is the ALJ determining this lady has the capacity to do some type of work, the doctor did an assessment. And when she did it, it's a form, it's not my form, there was another counsel at the hearing. And it's a form that looks to me to be somewhat modified from what Social Security uses. And you fill out and you make And later in this form, there's references to say, does this person have limitations that requires them to put their feet up, to recline, during the course of the work day. Not do your work, come home and get in the recliner. We can all relate to that. Does this person need to, in the course of a day, rest and recline? And the doctor says, yes, I would expect this lady's going to spend up to four hours a day in the recliner. And so the ALJ says, well, I'm going to ignore Dr. Norm again. She didn't have objective records. And that's inconsistent because she said she could sit for four hours and now she's saying she has to recline for four hours. Now the ALJ did not make any attempt to contact the doctor and determine if that was a conflict. I don't think it's a conflict. Those of us that have to do Social Security, that argue Social Security to you, the court is well aware, sitting involves feet on the floor. Okay? For us, those of us in the business, when you're not in the business and you think of reclining, when the doctor fills out this form and goes, yes, she's going to need to be in a recliner up to four hours a day. She's looking at sitting and reclining. I don't think she appreciates. Those of us on this side of the table are going to not understand what you've just said. But certainly, if there's no inconsistencies there from your perspective. I don't think that's so. And as I said, I didn't draft the form. But if it's ambiguous, then I think the judge, because from the point of view of the representative or the claimant, it's impossible to anticipate that's what the ALJ is going to latch onto. You better go to the doctor and try to resolve that ambiguity early. If the judge thought it was an ambiguity, he's got a duty. He has an affirmative duty to get a hold of the doctor and resolve the ambiguity. And that wouldn't have been very difficult. You send a letter and ask them, how do you explain those two things? That may be the reason we're here. The next reason the judge finds the claimant not credible and the doctor not credible is that she was able to, in fact, do part time work. I don't know how to explain that either. I'm going to use it the next time I get a speeding ticket and say, well, you said the speed sign says 45. I thought I could do 90. If she's able to work 20 hours a week, I don't know how you can use that to say that means, therefore, she can work 40 hours a week. It's a jump of monumental proportions. On top of that, the employer submitted a letter. Again, we've got a lay person. We've got a person who's supervising people making tacos. And she puts a letter in and says, even though she's scheduled to work here 6 hours, 5 days a week, she doesn't work that much. Routinely, she is so miserable at the office, I send her home. The employer directs her to leave. Now, the ALJ has responsibilities for credibility and says that I don't believe the employer. Well, the ALJ is responsible for credibility. But there needs to be something that represents a germane reason for that other than I don't like what they said. The germane reason. They're not in a position to observe them. They're supervising from a location someplace else. Some reason. But here we have the person supervising them directly, able to watch what they're capable of doing and not doing. And that person, as a trained supervisor, is saying, this employee is not able to do the work. Get out of here. And we don't have an explanation for why that testimony then is rejected or is not credible. I'd ask to reserve. So with the court's permission, I would reserve. Thank you. May I please record? My name is Richard Pruitt. I'm representing the Commissioner of Social Security in this matter. This is a case where the ALJ found that even with Ms. Singleton's significant limitations due to back pain, that there were still jobs in the economy that she could perform and jobs that were much less demanding than the part-time work that she was actually performing. So the treating physician's word is normally what we would want to go with unless the ALJ can give some pretty convincing reasons for rejecting that doctor's opinion. And here, let me just ask you the same question I posed to your opponent. Why isn't that May 24th, 2010 MRI, which I'm not a doctor, but when I just look at the results of it, it sounds like it documents some real, not imaginary back problems. Why isn't that the kind of objective medical evidence that would sustain Dr. Norum's, is that the treating doctor's name? Dr. Norum's opinion that in fact this back pain is real. She's not just making it up. I'm not just basing it solely on her non-credible subjective complaints to me. There's actually something in the medical records themselves that confirm that she's really got this debilitating back pain. Well, certainly the ALJ looked at and considered that MRI and discussed it at length. And the MRI is evidence of a problem in a back pain, which is not disputed. The ALJ came up with a residual functional capacity with significant limitations due to back pain. The MRI does not give specific evidence towards functional limitations or a specific case. Right, but the treating doctor does. And the ALJ, I assume, is not a doctor, right? Correct. So, we have a doctor, a trained medical professional who, based at least in part, according to your opponent on this MRI, says, these are the limitations that my patient has to have built into her work schedule. And the ALJ can't just say, well, I don't believe you. You're just a doctor. Get out of here. I mean, the ALJ has no medical expertise. So, I guess what I read the ALJ to say is that, well, no, I'm not going to credit Dr. Norum's opinions, which otherwise would, if believed, render this woman disabled under the law. Well, the ALJ says, I'm not going to believe that doctor because I think that doctor's opinion is based solely or mostly on the subjective complaints of the claimant, which I don't find credible. And I'm saying, that strikes me as inconsistent with this MRI, which seems to be objective medical evidence, that those complaints are real, not exaggerated. Well, and in this case, the ALJ did not list as a specific reason to discount Dr. Norum's opinion, that it was relying too heavily on subjective complaints from Ms. Singleton. The reasons he did give was, one, that the opinion was internally inconsistent all by itself. That was one reason. But another reason, I thought, was that it was based on subjective reports, which are not sufficient. He stated that he did not. He wasn't supported by the medical evidence. By her treatment notes, which is a slightly different thing, although he does state that it's inconsistent with the record as a whole. But he also does specifically discuss the MRI, and he doesn't discount that. He doesn't say that the MRI is showing that Ms. Singleton's capable. It's indeed showing a significant back problem, which is accounted for by the ALJ, not disputed. No, but the suggestion was that the doctor had not considered the MRI somehow. I had the same impression as Judge Watford, that somehow one got the impression that the ALJ thought that the doctor didn't even look at the MRI. I think what the ALJ did was not claim that there wasn't objective evidence of a problem, but rather there's no objective evidence that relates specifically to functional limitations in the workplace. And an MRI doesn't go to that. There are no strength tests, no clinical findings, no range of motion tests. In fact, the treatment records do not include even complaints of the type of pain and numbness that Ms. Singleton stated here. And the fact that he relied heavily on the fact that the opinion itself is internally inconsistent to a significant level, where if you say that you can sit, stand, and walk for seven hours but need to sit and recline for one, but then on the same opinion say that Ms. Singleton needs to actually recline for four hours out of the workday, those don't match. And it's not that Dr. Norm said that she needs to sit and was confused about whether legs up meant reclining. There were two specific line items in the record at 416. One is for sitting with legs up, and right under that is laying down or any refiner for four hours of the workday. So that's inconsistent with her other state abilities. She also states that Ms. Singleton's back problems don't affect at all her activities of daily living, which include such things as climbing stairs when earlier in the same opinion she said she should never be climbing stairs. So the fact that the opinion itself is so internally inconsistent, as with any witness, if somebody is telling you two different things, two opposite things, it's hard to put stock in either one of them. And so the ALJ had to take that into consideration. Specifically with regards to her hands and possible carpal tunnel, that issue very much did not have objective findings. The only objective findings were that Ms. Singleton had good hand strength and a full range of motion. The only clinical findings were regarding carpal tunnel. And yet, Dr. Norm- I'm not focused on the carpal tunnel finding. I agree with you on that. But let's just maybe turn to the ALJ's adverse credibility finding against the claimant, right? Because I think part of what the ALJ said, if I remember, is that you can't possibly be experiencing the level of back pain that you're complaining about given all of the things you do in your daily activities, right? And I guess I wasn't, maybe you can help me with this, I wasn't seeing how the kinds of daily activities the ALJ described were necessarily inconsistent with the limitations that the claimant would have to, you know, that would need accommodated to work in the workplace. Because I thought it was really her problem was she couldn't, she would need during the course of the day to put her legs up and, you know, would also miss, I think, what, three days a month or something like that. Those didn't seem to me to be inconsistent with the kind of very, the activities of very short duration that the ALJ cited as somehow being in tension with her complaints of back pain. So maybe you can help me out with that. Certainly, Your Honor. Now in the ALJ, when it comes to the activities of daily living, it's very easy to and plaintiff would have you look to each specific activity in a vacuum. You know, to look at one tree and say it doesn't constitute the forest. But the ALJ is duty bound to look at all activities, all functional capabilities as a whole. So when the ALJ, you know, uses that Ms. Singleton can drive, shop, she puts in her application, she cleans the toilets, the tub, does mopping, she takes care of, took care of a terminally ill father, a daughter, when looked at as a whole, they start to paint a picture of somebody who's not as limited as she testified to during the hearing. And particularly with regards to the part-time work. And again, that's part-time work that is much more demanding than the ALJ found Ms. Singleton was able to do, even at the 30 hours a week. She said she was working up to six hours a day, completely on her feet. And then the statements said that, well, she needed to take breaks for her back. The ALJ found that too, that she shouldn't be standing that much. She does need to take breaks. And so the work she did at part-time work, both at Subway and at Taco Treat, demonstrated abilities above what she said she could do at the hearing. It's not even to say that they show that she could work the same at full-time, which, indeed, the ALJ agreed she could. What about the testimony from her coworker and boss, which was disregarded for what seemed like quite inappropriate reasons? Well, and the reasons he gave. The reason was they weren't doctors. Well, we know they're not doctors. Well, and in general, he stated it was inconsistent with other activities and the record as a whole. But it's important to note that, you know, in only one statement, there were two statements given, and plaintiffs only challenged one. That was by Gina Dormady. That was at Subway, where she was no longer working. And she mentioned that she had back problems. She did not mention, like, known as, like, problems or hand problems. And then she stated that she was unable to perform the work because she needed breaks, that it was too much for her to stand for that length of time. That's actually completely consistent with the ALJ's finding of how little she needed. She could sit, stand, and walk, that she needed to have an alternate or to have the ability to alternate between sitting, standing, and walking throughout the day, and that she should not have a job where she would be standing up all day. It also, also, by the way, Gina Dormady stated that she, you know, went camping with plaintiff, which is just another example of an activity that is inconsistent with somebody, with the complaints that Ms. Singleton was making at the end of the hearing. MS. SINGLETON. What is inconsistent?  I didn't hear that. MR. LIEBERMAN. I'm sorry. MS. SINGLETON. The last thing you said was there's an activity that's inconsistent. MR. LIEBERMAN. In the Gina Dormady statement, she said she went camping with plaintiff. And going camping seems to be an activity that's inconsistent with the level of back pain and leg numbness and inability to walk on uneven surfaces and knee or crotch. MS. SINGLETON. It depends what you mean by camping. If you've been going in a camper and sleeping in the camper next to a lake, I don't know why it's inconsistent. MR. LIEBERMAN. It's a possible reasonable inference that the ALJ could have made. There certainly can always be other reasonable inferences. But it goes to show that the statement by Ms. Dormady is not terribly inconsistent with what the ALJ ultimately found with regards to how much Ms. Singleton could sit, stand, walk, and have various limitations. But to the extent that it was, he did state that it was inconsistent with all the other evidence, which, again, he has to look at all evidence, all treatment notes, all hearing testimony, including the opinions given by agency physicians, Dr. Schofield and Dr. Fernandez. And he also, with regards to plaintiff's credibility, raised the issue that in 2008 when she applied, it was she stopped her job at the time due to a layoff, not because of her disability. And as this corresponds, that's a – I'm sorry. Can I ask you – you mentioned that the non-examining physicians whose opinions the ALJ relied on, but I guess, you know, they gave their opinions before that MRI was done in 2010. And, again, I guess I just – I have a hard time understanding why the ALJ is entitled to just entirely discount the opinions of the treating physician who does have the 2010 MRI and say, instead, I'm going to credit the opinions of these other doctors who never treated the claimant and who didn't have the benefit of this most recent MRI. It just strikes me as an odd regime that allows the ALJ to do that. Well, certainly, Your Honor, but I don't believe that he totally discounted Dr. Norm's opinion, simply the more extreme portions of it. He took it into consideration and then gave good reasons why the extreme portions of it didn't match anything else in the record. With regards to Dr. Schofield and Fernandez, Dr. Fernandez was in possession of the earlier – or not in possession of the MRI, but statements to the fact that the earlier 2003 MRI showed a nerve impingement. So that was a known – I know, but that 2010 MRI just – again, I'm not a doctor, but, you know, I look at what it seemed to indicate and, boy, that sounds like a real problem. I could see how that would cause you major pain if you had those issues with your back. And I'm just saying the doctors' opinions whom the ALJ relied on, they didn't even have that. And that, of course, is far more current information about the claimant's condition than that 2003 MRI that was taken much earlier. Yes, Your Honor, but it was the – in 2003, they still showed nerve impingement. There was – while there shows some progression in 2010, it was the same issues. So Dr. Fernandez was aware of nerve impingement, and, indeed, the ALJ did not rubber stamp Dr. Fernandez. He added, you know, limitations that Ms. Singleton should seldom crouch and crawl, never climb, avoid temperatures, must have a sit-stand option. Again, these were limitations not found by Dr. Fernandez because the ALJ did have the benefit of seeing the MRI. So when he looked at everything as a whole, this is the residual functional capacity he found. He didn't rubber stamp Dr. Fernandez, and he didn't completely ignore Dr. Norm. He looked at everything together and then came up with a residual functional capacity supported by everything. That's all, Your Honor. Thank you very much. Thank you. I'd like to thank the Court. I guess if there's something I've learned after 35 years, it's quit talking. In spite of that, I'd like to do – I'd like to mention one thing. I think in terms of the objective evidence that was here, it had progressed from 03 until 2010, and I think the real error from the ALJ, if you've got a question about the treating of versus those objective findings, you have an obligation to just write and ask for an explanation, and they didn't do that here. That would have solved our problem. What are the objective findings? You mean the 2010 MRI? The MRI findings, Your Honor. When did Dr. Norm fill out the form? That was not until 2011, February 25th of 2011. Is there any note or record from Dr. Norm about the 2010 MRI? When she discusses it or evaluates it, or anybody discusses it or evaluates it? It is discussed by Dr. Ward, who was the – he's an anesthesiologist. He did the injection into the spinal canal. And Dr. Norm said – Yes. The reference for Ward's record shows that Norm was the treating physician, and we don't have any records from any other treaters. At one point in 2089, Dr. Norm says, you know, we really should get another MRI and see if we can figure this out, right? And then she does – is that where the MRI came from? She was referencing the fact that there had been an MRI done by the Great Falls Clinic. Right. There's no reference for treating, but that it physically had been done, and she wanted to get a copy of that, yes. And that was the one she was referring to, and I think that's the 2010 that eventually they reviewed. All right. Thank you very much. Thank you. In the case of Singleton v. Colby's.
judges: Berzon, Watford, Sammartino